| 8 | 891 |
| 53 | 315 |
| 8 | 891 |
| 54 | 318 |

JEREMIAH BALDWIN, Appellant, and EDWARD CAMPFIELD, Respondent.

The implication of law, that a grantee takes the conveyance in trust for the person who furnishes the purchase money, may be rebutted by proof that the title was put in the grantee for the purpose of protecting the property from the creditors of him who furnished the purchase money.

The case in Chancery is reported *ante,* page 600.

*A. Whitehead* and *Wm. L. Dayton* for the Appellant.

*F. T. Frelinghuysen* for the Respondent.

THE PRESIDENT, (CH. WILLIAMSON.) On the 7th day of Feb. 1838, Jeremiah Baldwin, the appellant, by deed of bargain and sale, with full covenants, duly executed and acknowledged by himself and wife, conveyed the land and premises, the subject matter of this controversy, to Edward Campfield, the respondent. At the time of this conveyance there was a mortgage incumbrance on the premises of six hundred dollars. As near as can be ascertained, from the evidence before us, this sum, at that time, was not far from the real value of the property. Edward Campfield neglected to put his deed upon record until the 1st day of June, 1839.

In the interval between the date of the deed and the time of its being recorded, to wit, on the 29th of June, 1838, Henry Spicer recovered a judgment against the appellant, for about one hundred and twenty or thirty dollars.

The Sheriff, by virtue of an execution issued upon this judgment, levied upon the land and premises in controversy, and on the 11th day of April, 1840, under this authority, made sale of the same.

Edward Campfield, the respondent, being the highest bidder for the property, the Sheriff, for the sum of one hundred and fifty-five dollars, executed and delivered a deed to Campfield.

Seven years after this sale, the appellant exhibited in the Court of Chancery the bill now before us. The grounds upon which relief is sought are embraced in a small compass.

The bill alleges, that Edward Campfield purchased the property at the Sheriff's sale for the benefit of the complainant, upon an agreement made between them to that effect; that the purchase money was advanced by the complainant, and that Campfield received the conveyance in trust for the complainant.

The prayer of the bill is, that Campfield be decreed to account for the rents of the property, and to re-convey to Baldwin.

If relief can be obtained, it is upon the ground, only, of a trust resulting from the fact that this property was purchased with the money of Baldwin.

The parol agreement, alleged to have been made between the parties, as to the purchase of this property at the Sheriff's sale, is wholly inadmissible for any other purpose than to show that the purchase money was furnished by Baldwin. The trust *results* from the fact that the purchase money was paid by him. It is not a trust created by an agreement made between the parties. Then, it would be, not a *resulting*, but an *express* trust. I need not stop here to show, that no relief can be afforded upon this bill upon the ground of any parol agreement between the parties. Trusts are *express*, and implied or resulting trusts. An *express* trust must be in writing. A *resulting* trust is a trust which is raised, or created, by act or construction of law. A trust, created by the act of the parties, is an *express* trust.

There has been great difference of opinion among eminent jurists, as to the admissibility of parol testimony to prove a resulting trust. In *Boyd* v. *McLane*, 1 *John. C. R.* 586, *Ch. Kent*, after a reference to *Sugden* v. *Sanders*, and others, remarks: If the point were *res integra*, I should be inclined to agree with Sir Thomas Clarke in *Lane* v. *Dighton*, *Amb.* 409, that such evidence is too dangerous in its consequences; but this objection comes too late, as the rule appears to be well established, and, as he observed, when he was obliged to bow to the authorities, "I must not be wiser than my predecessors."

The learned Chancellor reviews, with his distinguished ability,

all the prominent cases bearing upon the question. An examination of them will show a reluctance in the Courts to admit such evidence, and that it has never been received but with great caution.

In the case in 1 *Vernon*, the answer admitted that the defendant held the property in trust, but denied the trust set up in the bill, and insisted on the statute of *frauds* and *perjuries*, there being no declaration in writing of any trust for the plaintiff. The report of the case states, the chief point was, whether when a man purchases land with his own money and takes the conveyance in another man's name, this is such a resulting trust by implication of law as is secured by the statute and needs no declaration of trust. And, after a long debate whether the plaintiff should be admitted to prove the money was his, the proofs were read; and they amounting to only what had passed in discourses, and been owned by the defendant, and the proofs being doubtful, the *Master* of the *Rolls* dismissed the plaintiff's bill, because the proofs were not sufficient whereon to ground a decree; and said, there was some secret in the cause, which he did not fully apprehend, and was not made clear upon the proofs. Now, the truth of the fact was, that this great house was bought with design to make a Nunnery of it, and the said *Elizabeth Thwing* was to be the Lady *Abbess;* and that project failing, the defendant set up for himself.

In *Bartlett* v. *Pickersgill* (cited in a note to 4 East. 577) there was no written agreement, nor *was any part of the purchase money paid by the plaintiff.* The parol proof was rejected.

In this case, it, perhaps, sufficiently appears that the purchase money was paid by Baldwin. If this be so, the implication of law is, that the grantee took the conveyance in trust for the person who furnished the purchase money, *unless* there is something in the relationship of the parties, or in the character or situation of the property, to rebut such presumption. In my opinion, such presumption is rebutted; and I am further of opinion, that the case, as made by the complainant, by his pleadings and proofs, is one not entitled to the favorable consideration of a Court of Equity. A Court of Equity deals with the consciences

and the motives of men. It will not countenance fraud however disguised. It will not, because the meditated fraud, from fortuitous circumstances, has not been perpetrated, overlook the fraudulent intent and purpose. Nor will the Court weigh the merit and demerits of fraud doers in nicely balanced scales, for the purpose of determining the least iniquitous of the two. The man who asks its aid, must himself have a good cause and a clear conscience. In the case of *Gascoigne* v. *Thwing et al*, 1 *Vern.* 366, one reason given for the dismissal of the bill was, that the whole case showed some secret in the cause not disclosed. What is more consonant to our judgment, and native impulse of honesty, as to the principles upon which equity should be administered, than that the suitor whose cause will not bear the statement of the naked truth but must be presented in disguise, is not entitled to relief in a Court of *conscience.*

As this case is presented by the bill, as well as by the proofs to support it, is it not clear, beyond any doubt, that there is something concealed which is not consistent with honesty, and which both the complainant and defendant have studiously endeavored to cover up from the view of the Court? Is there any one doubts, that the deed of the 7th of Feb'y, 1838, was executed for the purpose of defrauding Jeremiah Baldwin's creditors? Why was the Sheriff's title made to Campfield? Was it for convenience, or was it to carry out the original fraudulent purpose the parties had in view? It ought not to be forgotten that this bill is sworn to, and that, both in a Court of law and equity, the *suppressio veri* meets with no more encouragement than a *suggestio falsi.* It would be a loose [morality for the Court of Chancery to countenance, to lay down the rule, that a party approaching that Court, and speaking with the solemnity of an oath upon his conscience, might conceal the truth of his case, because that truth would reveal his own iniquity. This is not the age, nor, I trust, ours the community, in which it is to be expected that any Court will lower its standard of morality.

In order for the appellant to entitle himself to the relief sought, by a decree of the Court of Chancery, on the ground

that the payment of the purchase money by him would raise an implication of a trust in his favor, it was necessary he should move out of his way the deed of the 7th Feb'y, 1838, which, remaining in force, rebutted the implication of a trust arising from the mere fact of his having paid the consideration money at the Sheriff's sale. Accordingly, an effort is made to avoid the legal effect of this deed in several ways. First, it is alleged in the bill, that Campfield sets up such a deed, by way of pretence, to defeat the trust, and that, if he has such a deed, it was never lawfully delivered.

All that the bill contains in reference to the deed is this :—

"And at other times the said Edward Campfield pretends, that he holds the title to said premises by virtue, or in pursuance of, some other deed, or conveyance, thereof, from your orator, or some other person; whereas your orator denies, that any such other deed, or conveyance thereof, if any such deed, or conveyance, he has, was ever lawfully delivered to him, or that he ever paid any consideration for the same; and he declares and insists, that the truth is, that the said Edward has frequently declared (observe, the bill does not say, that so the complainant declares the truth to be, but, *that the said Edward has frequently declared*) that he never received any such other deed, or conveyance, and that he had no title for said premises other than such as he derived from said purchase at Sheriff's sale, and the conveyance thereupon made to him by said Sheriff."

This is virtually an admission, that such deed was signed, and sealed, and delivered, by the grantor to the grantee, but denying that it was *legally* delivered; and the inference is, that because it was not lawfully delivered, therefore it is invalid and should be disregarded. The facts, if it be so, that the deed was without consideration, and that Campfield made the declarations alleged, are no impeachment of the deed. But, if not *lawfully* delivered, in what respects was the delivery unlawful, and under what circumstances was it delivered? If a party seeks redress against a fraud, it will not do for him simply to allege, that he was defrauded; but he must state, in detail, the circumstances, and must show in what the fraud consists. If he seeks to set aside

a deed which has been procured from him under fraudulent pretences and devices, it will not do simply to allege it was not lawfully delivered. He cannot charge in his bill, that it was not lawfully delivered, and sustain such allegation by proof that it was forged.

Who can doubt, from the case made, that the deed was delivered, and that its purpose was a fraudulent and unlawful one? Who can doubt, that the Sheriff's deed was made to Campfield to carry out that same unlawful purpose? What other hypothesis is there consistent with the whole transaction? But, it is said, admitting the original deed to have been fraudulent, it is not clear that the deed from the Sheriff was so, and that if it was not, the respondent ought not to be permitted to protect himself under the fraudulent deed made to him by the appellant.

There are several answers to this. In the first place, you cannot separate the transactions. If the first deed was made for a fraudulent purpose, the reason why the Sheriff's deed was made to the son-in-law is apparent. Why was not the Sheriff's deed made directly to Mr. Baldwin? If not to carry out the original purpose, why did not the bill state the naked truth of the whole case, and draw the line of distinction between the iniquity of the first, and the honesty of the second transaction. If he had repented of his sin, the best evidence of that repentence was to be looked for in his confession of it. The testimony of Mrs. Mary Hall confirms what is too manifest throughout the whole transaction to be concealed. In reference to the purchase by Campfield, at the Sheriff's sale, the counsel of the respondent put the question—Did Mrs. Baldwin ever say that the house was ever held by Campfield in trust? She replied, yes, she always said so. I understood the property was bought with that debt on it, and she was to raise the money to pay it. The appellant's counsel immediately followed up this answer by asking—Did Mrs. Baldwin say that Campfield held the property in trust, or did she say that complainant held it so that their creditors should not take it away from them? Answer—I think she expected some other debt was coming against them. Again—Did you understand that this property was put in Campfield's hands

only to protect it from creditors? Answer—I always under-stood so. But my second answer is, that it is putting the bur-then on the wrong party to say that it is the respondent who is seeking to defend himself under the first deed. The appellant claims the benefit of the trust, by implication of law. That im-plication is rebutted by his own deed, and it is for him to remove that deed, before the implication can be in his favor.

But there is a third and conclusive answer. If the respond-ent does set up the deed he has a right to do so as between him-self and his grantor. Sound morality sanctions it. If Bald-win concocted that conveyance to defraud his creditors, it is "even-handed justice that presents the poisoned chalice to his own lips." It is hardly compatible with the principles upon which a Court of equity administers justice, to hunt up some technical rule to protect a party against the consequences of his own fraud. The statute for the prevention of frauds and per-juries declares the deed, as between the grantor and grantee, to be valid ; and to deny to the respondent the benefit of this deed, is in violation of the letter, and contravenes the policy of the statute. Any rule, of law or equity, that will prevent the re-spondent in this case from setting up his deed, must necessarily lead to contravene the policy of the law, which makes a deed fraudulent as against creditors, valid and effectual as between the grantor and grantee. If Baldwin had brought an action at law to recover the possession of the premises, Campfield might have set up, in defence, this deed. There is no rule, either of law, or equity, or morality, why he may not use it for the same purpose in this case.

Again, it is said, the deed in question is proved to have been *cancelled* by the parties.

Such an issue is not made by the pleadings, and it is no more competent, under the case upon the record, to prove that it was cancelled under a verbal agreement, or arrangement, between the parties, than by a subsequent sealed instrument which effected that object.

But what is the proof of the cancellation ? The deed being produced, it appears that the names and seals of the grantors had

been torn off and again neatly attached by some material used for the purpose. There is not a particle of proof as to when, how, or under what circumstances such mutilation was made. The deed, as presented, is perfect, and the circumstance referred to excites a suspicion only, that the names and seals might have been torn off for the purpose of cancelling the deed. The deed was acknowledged according to law, and duly recorded.

But to my mind there is a most satisfactory answer, and conclusive against the appellant, as to this point. If the mutilation was made by the parties, and for the purpose of destroying and cancelling the deed, why did not the bill so allege? If the complainant was unwilling to make such an allegation under oath, most assuredly it is asking too much of the Court, upon mere suspicion excited by the appearance of the deed, to come to such a conclusion. The charge was, not that the deed was cancelled, but that it was not delivered, and that charge has been met by the answer and been lawfully disposed of. Had the allegation been made in the bill, that the deed had been cancelled, the respondent would have had an opportunity of answering it. He was entitled to that opportunity, and to decide this cause upon any ground which denies him this right would be a palpable violation of the fixed rules and principles upon which equity has always been administered.

There is a prevailing opinion, that the merits of every cause in a Court of Chancery must·be measured by the conscience of the Chancellor, and each cause be decided by the dictates of that conscience, untrammeled by any fixed principles or rules. If this were so, the rebuke of Selden would be as true as it is facetious : " For law we have a measure and know what to trust to. Equity is according to the conscience of him that is Chancellor ; and as that is larger, or narrower, so is equity. 'Tis all one, as if they should make the standard for the measure the Chancellor's foot. What an uncertain measure would this be? One Chancellor has a long foot—another a short foot—a third, an indifferent foot. It is the same thing with the Chancellor's conscience."

But this is not so. The principles upon which equity is ad-

ministered are as fixed, as well defined, and as certain as those which regulate the proceedings and decisions of the Courts of common law. The remark of Lord Redesdale is eminently true: "There are certain principles on which courts of equity act, which are well settled. The cases which occur are various, but they are decided on fixed principles. Courts of equity have, in this respect, no more discretionary power than courts of law. They decide new cases as they arise by the principles on which former cases have been decided, and may thus enlarge the operation of those principles. But the principles are as fixed and certain as the principles on which the Courts of common law proceed."

We must not be misled by any supposed hardship of the case. The conduct of the son-in-law, in this transaction, may justly excite our indignation. Our sympathies are naturally with the old man whom he may have deceived and wronged; and yet we may not violate a single principle, upon which law and equity are administered, to punish the one, or vindicate the other. Mr. Justice Story remarks: "Many cases of trust may exist, in which the parties must abide by their own false confidence in others, without any aid from Courts of justice. Thus in cases of illegal contracts, or those in which one party has placed property in the hands of another for illegal purposes, as for smuggling (and he might have added for hindering, delaying, or defrauding his creditors), if the latter refuses to account for the proceeds, and fraudulently, or unjustly, withholds them, the former must abide by his loss; for *in pari delicto melior est conditio possidentis et defendentis* is a maxim of public policy equally respected in Courts of law and Courts of equity."

To my mind it is perfectly clear, that there is nothing in this case to prohibit the respondent's setting up the deed of February, 1838; and such being the case, it is equally clear, that that deed rebuts the implication of a trust, which otherwise would arise in favor of the respondent, by reason of the payment of the purchase money for the title made by the Sheriff.

By the payment of that money, he paid for property which he had before, by deed of warranty, conveyed to Campfield. He

paid a debt which morally, and by law, he was bound to pay. Can he claim, in a Court of equity, after he has allowed his own grantee to take the conveyance, that the payment of his own debt raises an implied trust in his favor, and that in equity and good conscience he is entitled to the property? Is it the fair implication, that he paid the money to relieve the property of his 'grantee from the burthen which he himself had placed upon it— from his own debt—or is the implication that the payment was for his own benefit? It was his own debt that he paid. It was an incumbrance on the property he was bound in equity to re- move. It was honest that he should do so. The fact that he al- lowed his grantee to take the deed is an evidence that he made the payment for his grantee's benefit. The necessity for im- plying a trust in this case does not exist. A Court of Chancery never has, and never will, imply a trust unnecessarily. In the case of *Cook v. Fountain*, 3 *Swanston's Rep.* 591, the Lord Chief Justice, in speaking of these different kinds of trusts, says : " There is one good, general and infallible rule that goes to both these kinds of trusts ; it is such a general rule as never deceives ; a general rule to which there is no exception, and that is this ; the law never implies, the Court never presumes a trust, but in cases of absolute necessity. The reason of this rule is sacred ; for if the Chancery do once take the liberty to construe a trust by implication of law, or to presume a trust unnecessarily, a way is open to the Lord Chancellor to construe or presume any man in England out of his estate ; and so, at last, every case in Court will become *casus pro amico*."

Perhaps the language of the Lord Chief Justice is too strong. But in the case before us, there is not only no necessity, but no propriety, in implying a trust in favor of the appellant. And I may add, within the range of authorities no case can be found to sanction such a conclusion. If, under the circumstances of this case, a trust results in favor of the appellant, hereafter, the Chancellor will be untrammelled by any principles to regulate his decisions in reference to resulting trusts, and you may take his conscience, or his foot, for the measure—it is all one.

In every view this case has been presented to my mind I am of opinion the bill should be dismissed.

1st. Because from the bill, and proofs to sustain it, it is evident the complainant concealed the real truth of this case, and although the defendant's answer, and the case made by him, only makes the "darkness visible," this can neither restore the purity of the complainant nor entitle him to any more favorable consideration from the Court.

And 2d. Because the deed of February, 1838, upon every principle which has ever been recognized by a Court of equity in the exercise of its jurisdiction in reference to resulting trusts, rebuts every implication of a trust that can arise from the fact of the payment of the purchase money by the appellant as a consideration for the Sheriff's deed of June, 1838; and whether the first mentioned deed is to be considered as a *bona fide* deed between the parties, or as one concocted for the purpose of defrauding creditors, the pure administration of justice, the policy of the law, and sound morality, require us to regard it as valid between the parties, and to give it, as to them, its proper and legitimate effect.

Chief Justice GREEN, Justice OGDEN, and Judges ARROWSMITH, HUYLER, CORNELISON, WILLS and RISLEY concurred in this opinion.

ELMER, J. When this cause was argued, I felt strongly inclined to the opinion, that the circumstances of the case would entitle us to consider the defendant as holding the property in trust for the plaintiff. Subsequent reflection however has satisfied me that this cannot be done, without disregarding the well settled principles of law and equity.

It is insisted, on behalf of the appellants, that this is a case of resulting trust, it being the well established doctrine in equity, that if a man buys land, in the name of another, and pays the consideration money, the land will generally be held by the grantees in trust for the person who pays the consideration money. (2 *Stor. Eq.* § 1201, and cases cited.) I do not feel

any doubt, upon the evidence, that it is true, as the bill alleges, that the purchase money was, most of it, in fact, advanced by the plaintiff, with the assistance of those friends who kindly interposed to aid him when he was in distress; although a considerable part of it was raised by means of defendant's note. The answer admits that nothing was paid by the defendant.

But it appears that long before the purchase made at the Sheriff's sale, and before the entry of the judgment, a deed was made by the plaintiff to the defendant for the same property, which recites a money consideration and contains covenants of warranty and seizin.  There can be little doubt that this deed was originally designed to protect the property from the judgment or other creditors; but, if such was the design, it was afterwards abandoned, for the title of the defendant was never set up against the judgment, and in fact the deed was not put on record until some time after the judgment.  Let the design of that deed however have been what it may, as between the parties it is a good and valid deed.  The maker of it is estopped from denying that the object was a lawful one, and also from denying that it was made, as it purports to be, for a valuable consideration. He is also estopped from denying that he had a good title to the premises and from setting up any after acquired title in opposition to it.

This deed is set up in the answer and has been produced in the evidence.  It has been attempted to invalidate it by the fact that it appears to have been torn.  There is, however, no proof that the tearing was designed to cancel it; and even if it was, the cancelling of the deed would not divest the grantee of the estate.  Although the making of this deed was of course known to the plaintiff, the bill does not impeach it and put in issue its cancellation or alteration, and does not allude to it except in the charging part, where it is stated that defendant sometimes pretends he holds title in pursuance of some other deed or conveyance from the plaintiff or some other person; and the averment in opposition to this pretence, is a denial that such deed, if any such deed he has was ever lawfully delivered to him, or that he ever paid any consideration for the same.  At the most then, the

only facts put in issue by this charge are, whether the deed was duly delivered, and whether any consideration was paid. That "it was delivered is proved by the plaintiff's acknowledgment in due form, and as to the consideration, the plaintiff is estopped from denying it, for the purpose of impeaching the validity of the deed. (1 *Greenl. Ev.* § 26, *N.*) The deed then, I think, must be considered a valid subsisting deed.

The case then is, that the defendant was in possession of the plaintiff's deed for the property and it was deemed advisable that it should be sold upon a judgment, which, although subsequent in date to the deed, it was thought desirable to extinguish. The plaintiff, through the assistance of friends, furnishes the money to pay for it, and the defendant at his request bids it off, and takes the deed in his name. Without further proof, certainly no trust can result. The natural presumption would be that the deed is taken to perfect the title, the defendant acquired, under the deed from the person against whom the judgment was. It was the duty of the plaintiff to pay off that judgment, and to make good the title he had professed to convey. And since he is not permitted to invalidate his own deed by denying that it was made for the consideration expressed, he cannot be permitted to deny, that he paid the money to perfect the title, he professed to convey.

To permit him to show a trust by the parol evidence he has produced, would be wholly to disregard the statute of frauds, which requires all trusts of land to be proved by some writing signed by the party. The trust which results from the mere fact, that one person pays the purchase money of land conveyed by the seller to another, is considered as coming within the exception in the statute, of trusts which arise or result by implication or construction of law. But no trust arises upon a man's own deed, no matter whether there was in fact any consideration paid or not; as between the parties, a voluntary deed is just as binding as any other. There can be no doubt, indeed counsel did not deny, that any parol declarations of the defendant, or any understanding between him and the plaintiff, not reduced to writing, would be inadmissible to show a trust, in regard to the

original deed. If a trust in reference to the Sheriff's deed be allowed, how can it affect the other? So far as the plaintiff is concerned, the Sheriff's deed is wholly immaterial and may be laid out of the case. The plaintiff to succeed in obtaining a conveyance of the property to him, must also get rid of his own deed. So long as that remains in force, his mouth is shut, he cannot claim in opposition to it.

A resulting trust has its origin in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the money, means the purchase to be for his own benefit, rather than for that of another, and that the conveyance in the name of the latter is a matter of convenience and arrangement between the parties, for other collateral purposes. But in a case like this, there is no room for any presumption in the matter. The conveyance is made to the defendant, because he holds the man's deed who now pays the money. If the plaintiff had taken it in his own name it would have been wholly useless to him; he could not have alleged that his own deed was fraudulent, or that it was not executed when it purported to be. If his deed had been of later date than the judgment, so that the title under the judgment would have been paramount, the case would have been the same; he could not have set up a paramount title against his own covenants of warranty. Certainly nothing can be plainer than that a man cannot make a deed for property subject to a judgment for his own or any other person's debt, and then turn round and purchase under that judgment, and thus supersede his own deed. If his own deed was made before the judgment, although, if voluntary, it may be void as against the judgment creditor, as against himself it is binding.

The plaintiff's reliance, however, is not upon the natural presumption, arising from the mere payment of the purchase money, but upon the evidence in the cause, which it is said proves that the intention of the parties was, that the property should be held for the benefit of the plaintiff and his family. I am not satisfied that the evidence does show any intention to annul the title under the plaintiff's deed, or that the intention was that the title should be held in trust at all. The object undoubtedly was to

prevent the plaintiff and his family from being turned out of their home, by means of the Sheriff's sale; but that could be effected, as in fact it was, by the defendant's holding the title, and permitting the plaintiff and his family to remain in possession as long as they thought proper, without paying rent. The circumstances of the case indeed, so far from raising a presumption that there was a resulting trust, which would enable the plaintiff to call for a conveyance of the property to himself, tend rather to show the contrary. They show that for some reason, and probably to prevent the interference of creditors, the design was that the defendant should continue to hold the title, and appear, ostensibly at least, to be the owner. Not one word was said about giving up the plaintiff's deed. On the contrary, it was put on record just previous to the issue of the execution, and was of course on record when the Sheriff's sale took place.

But supposing it to be satisfactorily proved, by the parol evidence produced in the cause, that the intention was to regard the first deed as of no force; can such evidence be received to prove that the title derived from that deed was abandoned, or was to be held in trust? An express declaration of the defendant, at the time that deed was delivered to him, it is clear, could not avail to prevent its operation, according to the terms of it. How then can a subsequent agreement by parol be received for such a purpose? A formal title, by a solemn deed, cannot thus be avoided. So long as the statute of frauds remains in force, no deed absolute on its face can be turned into a trust by any declaration of the parties,, not reduced to writing. In the absence of any rebutting facts, the payment of the purchase money is held to have that effect, but never in the face of the parties' solemn deed to the contrary.

No case like the present has been produced by the counsel, nor am I aware of any. *Leman v. Whitney* (4 *Russell* 422) may be referred to as somewhat analagous. A son had conveyed to his father, nominally as a purchaser, for the consideration expressed in the deed of £400, but really as a trustee, in order that his father, who was in better credit than his son, might raise money upon it by way of mortgage, for the use of the son. The
56

father died before any money was raised, and the Vice Chancellor held the case to be within the statute of frauds, and parol proof inadmissible to prove the trust. Considering the father as a purchaser for the consideration stated in the deed, and it being proved that he never paid the £400, he held that his son as a vendor had a lien on the property for that amount. In this case the non-payment of the consideration money is not proved; and if it was, the circumstances of the case rebut the presumption of a lien. The deed was either a voluntary deed, or made to defraud creditors, and in either aspect no lien for the nominal consideration money can be enforced.

Considering the defendant as by virtue of the first deed a purchaser for a valuable consideration, as I think we are bound to do, there can be no resulting trust. By the common law, where a feoffment was made without consideration the use resulted to the feoffor. But even a nominal consideration vested the use in the feoffee. The case of a resulting trust is considered as analagous to the rule of the common law, and therefore wherever the grantee has paid a consideration the trust will not result. In the case of *Dyer v. Dyer* (2 *Cox R.* 92) Chief Justice Eyre regrets that in the case of a deed made to a child, the consideration money being paid by the father, such child had not been considered as a purchaser for a valuable consideration, instead of its being a mere circumstance of evidence, admitting of evidence on the other side, for as a purchaser the trust would be rebutted, and all circumstances of evidence shut out.

The case of a trust resulting from the fact of one man's paying the purchase money, when the deed was made to another, is too well established by a long course of decisions to be overthrown. But the danger of allowing the title to land to rest upon certain presumptions, arising out of parol proof of the payment of the money, has been always admitted; and I am unwilling to extend the doctrine beyond the precedents.

It has been doubted whether a resulting trust can be sustained where only a part of the consideration money was paid by the party claiming to be the *cestui que trust*. But admitting that it can, as seems to be the better opinion, the land in such a case

would be charged *pro tanto*. (*Wray v. Steele*, 2 *Ves. and B.* 388; *Bostford v. Burr*, 2 *John C. R.* 410. Considering the defendant as a purchaser for a valuable consideration, and the deed from the Sheriff as a necessary part of his title, the strongest equity that can be raised against him will be, to charge his land with the money that was actually paid by the plaintiff to obtain the title under the judgment.

To this extent, as the case stands, I think the plaintiff, under the general prayer in his bill is entitled to relief, and that the Chancellor erred in dismissing his bill. In his answer the defendant says : "If the judgment was a valid and subsisting lien on the said premises at the time of said sale, this defendant is willing to pay to the said complainant such sum as he in the opinion of the honorable Court is entitled to in consequence of any payment which may have been made by him in satisfaction of such lien." That the judgment was a valid and subsisting lien appears to be beyond doubt, and I see no reason why the defendant should not be held to an offer so entirely in accordance with what is just and equitable, although without such offer there might be difficulty in requiring him to do even that much.

My opinion therefore is, that the decree ought to be reversed and the case sent back to the Chancery that an inquiry may be made as to how much the plaintiff paid, and that the appellants may have relief to that extent, with interest after the defendant took charge of the property.

VALENTINE, Judge, concurred in this opinion.

The decree of the Chancellor was affirmed.